**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DANIEL WINIGER** | : | |
| 12660 County Road 153 | : | |
| East Liberty, OH 43319 | : | |
| | : | |
| Plaintiff, | : | CASE NO. 2:23-cv-1084 |
| | : | |
| v. | : | JUDGE |
| | : | |
| | : | MAGISTRATE JUDGE |
| **HONDA DEVELOPMENT &** | : | |
| **MANUFACTURING OF AMERICA, LLC** | : | |
| 21001 State Route 739 | : | **Jury Demand Endorsed Herein** |
| Raymond, OH 43067 | : | |
| | : | |
| Defendant. | : | |
| | : | |

## COMPLAINT

NOW COMES Plaintiff Daniel Winiger ("Plaintiff") and proffers this Complaint for damages against Defendant Honda Development & Manufacturing of America, LLC ("Defendant").

## THE PARTIES

1.      Plaintiff is a natural person residing in Logan County, Ohio.

2.      Defendant is a domestic limited liability company doing business in the Southern District of Ohio.

3.      At all relevant times, Plaintiff was an employee as that term is defined by the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, et seq. ("ADEA") and by O.R.C. Chapter 4112.

4.      Defendant is an "employer" as defined by the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, et seq. ("ADEA") and by O.R.C. Chapter 4112.

## JURISDICTION AND VENUE

5.      This action is brought pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, et seq. ("ADEA"), the Ohio Laws of Discrimination, R.C. Chapter 4112 ("Chapter 4112"), and 28 U.S.C. §1331.  This Court's jurisdiction in this matter is also predicated upon 28 U.S.C. §1367 as this Complaint raises claims pursuant to the laws of Ohio, over which this Court maintains supplemental subject matter jurisdiction.

6.      Venue is proper pursuant to 28 U.S.C. §1391 because Plaintiff entered into an employment relationship with Defendant in the Southern District of Ohio, Plaintiff performed his job duties there, and Defendant is doing and has done substantial business in the Southern District of Ohio.

7.      Plaintiff has complied with all jurisdictional prerequisites to the filing of this lawsuit and this Complaint is filed within ninety (90) days of Plaintiff's receipt of his Right to Sue letter from the Equal Employment Opportunity Commission, a copy of which is attached hereto as "Exhibit A."

## FACTUAL BACKGROUND

8.      Plaintiff was hired by Defendant on or around January 21, 2000. During his time at Defendant, Plaintiff advanced in the company, and in his most recent role, he was employed as a Senior Engineer.

9.      In that role, Plaintiff oversaw instrument panel design and safety restraint systems design for Defendant's automobiles.

10.     Plaintiff was a strong performer at Defendant for over 22 years. He received consistently strong performance reviews and yearly raises. Plaintiff routinely was rated 4/5 or 5/5 on his annual performance reviews. On June 10, 2022, he received a merit-based raise because of his performance.

11.     Plaintiff's date of birth is June 11, 1962. Therefore, Plaintiff is a member of a protected class based on his age.

12.     Because of his experience and expertise, Plaintiff's team members on various projects constantly praised his performance. He received accolades for his work from Ross Burghardt, Project Leader for the Interior Group and from Todd Hemmert, Assistant Large Platform Leader. The Chief Evaluator for Rattle & Squeak, Trent Bozzo told Plaintiff that he "loved" Plaintiff's Technical Sections of his presentations.

13.     Because of his experience, Plaintiff was highly regarded by the 3PP Project Team for his role as Instrument Panel Chief. Moreover, Technical Expert, Fuyuto Takeyama informed Plaintiff multiple times that Plaintiff was doing a "good job" with chairing difficult meetings among the Styling, Supplier, and other Functional Groups.

14.     In the beginning of 2022, there was a merger and restructuring within Defendant. As a result of the merger, all associates were reevaluated based on performance, job classification, and other metrics.

15.     Defendant's purpose with the reevaluation was to verify the employees' job classifications, ensuring that each associate was properly classified. After the

evaluation, Plaintiff was deemed to be properly classified in his position, which indicated that he was qualified and performing satisfactorily in his role.

16.     However, despite his 22+ years with the company and consistently strong performance, Plaintiff began to get pushed out of the company because of his age. At the time Plaintiff experienced discrimination by Defendant, he was 60 years of age.

17.     On May 19, 2022, Plaintiff's Group Manager, Sarah Boylan (newly promoted to her first-time management role) abruptly and surprisingly notified Plaintiff that he was being placed on a performance improvement plan.

18.     This news came as a shock to Plaintiff, especially because the Project Leader, Ross Burghardt—the person traditionally responsible for managing team performance—had never alleged to Plaintiff that his performance was deficient. Rather, Plaintiff received praise from Mr. Burghardt often.

19.     The performance improvement plan was not intended to redirect or improve areas of Plaintiff's performance. Instead, it was designed to overwhelm Plaintiff with work that would be nearly impossible to accomplish.

20.     The May 19 performance improvement plan listed mostly poorly defined and immeasurable improvements such as "strive to work independently" or "ownership of your projects." The plan included two measurable metrics: "Complete RSB Design Guide by July 1, 2022" and leading the 25M Passport Development Activity, which included various dates for completion.

21.     These requirements set Plaintiff up for failure. Plaintiff's primary job duties were to act as Instrument Panel (IP) Design Chief for the Minor Model Change Project 3PP. In a similar Minor Model Project, the IP Design Chief, Taylor Larsen had

four dedicated support designers, including two Contract Designers and two Defendant Design Engineers.

22.     Although Plaintiff's project was marginally smaller than the other project, Ms. Boylan only granted one Contract Designer to assist on Plaintiff's project and no engineers.

23.     Not only that, but when Ms. Boylan asked Plaintiff for his preference of who would assist on his project, Plaintiff provided three names of Contract Designers who could assist him. Plaintiff ranked each person in terms of who he most preferred to work with and who he least preferred to work with based on their skill and expertise. Ms. Boylan assigned the lowest ranked Contract Designer to work with Plaintiff.

24.     For context, the RSB Design Guide was a summary of the research work that Plaintiff conducted with BASF on replacing a Magnesium Steering Hanger Beam (SHB) with a Nylon/Carbon Fiber equivalent. Plaintiff completed this design while working remotely during the COVID-19 shutdown. This was reviewed weekly with Manager, Cordell Bosma; Technical Leader, James Yang; and SHB Technical Expert, David Salmonowicz. Due to the two projects that Plaintiff was the Design Chief for, (3XP & 3PP), the RSB Design Guide did not get issued. It was not a priority.

25.     In February 2022, Plaintiff asked Mr. Yang, Technical Leader, responsible for issuing the Design Guide, "what do we need to do to issue the RSB Design Guide?" Mr. Yang responded that he would like to look at it one more time. As time went on, Ms. Boylan was promoted to Manager. She did a complete markup of the RSB Design Guide, marking every page, stating that the document did not "flow well" and was hard to follow.

26.     Yet, the reason Ms. Boylan did not follow the document is because she had no experience or exposure to the highly technical content of the subject. The other managers did not have issues following Plaintiff's designs—a skill that, again, he has developed for over 22 years.

27.     In addition, after the Warning Letter (discussed below) to Plaintiff, Ms. Boylan requested that the RSB Design Guide be changed to a "Generic Fiber Reinforced Plastic Design Guide." This task required completely restructuring and reformatting the document, as well as adding additional content. This Design Guide was not a priority for the ID-1 Group, because there were no short-term plans to apply the BASF Fiber Reinforced Materials to any Mass Production Project.

28.     Upon information and belief, the stages of completion of the Design Guide remains where Plaintiff left it, and no one has undertaken its completion.

29.     Moreover, the demanding July 1 deadline for the RSB Design Guide was unattainable given Plaintiff's schedule. And management was fully aware of this.

30.     Plaintiff's schedule showed that the project required a V1 drawing issue and Styling Feasibility Fix for the 25M Passport, tasks which warranted significant amounts of time to accomplish.

31.     From June 6 through June 24, Plaintiff worked 12-to-14-hour days to ensure that all 14 of his scheduled drawings were delivered on time, which is the top priority of Chief Designers. All 14 of Plaintiff's drawings were completed before the deadline.

32.     These accomplishments demonstrate that Plaintiff was proficiently leading the 25M Passport Development Activity. Because of the demanding schedule, he was unable to complete the RSB Design Guide by July 1.

33.     In fact, one of Plaintiff's managers, Cordell Bosma, implicitly agreed with the unfeasibility of completing the RSB Design Guide by July 1 by approving Plaintiff's proposed schedule changes, which set the deadline for the RSB Design Guide a couple of months later.

34.     On June 21, Plaintiff met with Ms. Boylan, Mr. Bosma, and Mr. Yang to review his first 30 days of performance and to set goals for the remaining 30 days of his performance improvement plan.

35.     Feeling that the meeting went well, Plaintiff left the meeting with the belief that he was hitting his required targets. Ms. Boylan sent a follow-up email, noting that their expectations for Plaintiff over the next 30 days were to put together a decision analysis, focus on having a clear schedule, and provide clear and timely communication— additional examples of vague and immeasurable expectations.

36.     On August 5, despite his hard work, Plaintiff received a warning notifying him that his performance was still not meeting expectations.

37.     The warning listed a few areas where Plaintiff was allegedly not meeting expectations. However, most of the expectations that Ms. Boylan provided were illegitimate, and there were no valid business reasons for her demands.

38.     For example, the letter alleged that Plaintiff failed to complete a project by the deadline, August 1, but that deadline was arbitrary given that the Design Guide—the

overall issue that his project was assigned to—did not have an end date in sight. It could have been another year for that Design Guide to be completed.

39.    Ms. Boylan's arbitrary deadlines and demands were designed to set Plaintiff up for failure.

40.    Moreover, the warning claimed that the quality of one of Plaintiff's design guides did not meet expectations. Yet, when Plaintiff met with the Japan Office and his managers—the intended audience of his design guide—to discuss the design guide, neither management nor the Japan Office were dissatisfied with the quality of the work.

41.    Moreover, the warning alleged that Plaintiff failed to propose a new schedule to Ms. Boylan. But this allegation is false.

42.    Plaintiff sent a screenshot of his schedule to Ms. Boylan. If Ms. Boylan was dissatisfied with the screenshot format, she could have requested the excel spreadsheet to view the schedule in a different format. She did not.

43.    Yet only in Plaintiff's warning letter did Ms. Boylan criticize Plaintiff, saying that the schedule was too small to read. Ms. Boylan was, therefore, more focused on contriving and documenting any examples of deficient performance rather than constructively addressing her dissatisfaction so Plaintiff could improve.

44.    Defendant terminated Plaintiff on September 27, claiming that he had failed to improve his performance and demonstrate a sustained level of satisfactory performance.

45.    In his termination meeting, Plaintiff asked Ms. Boylan what deadlines he missed that made his performance unsatisfactory. Ms. Boylan could not identify one deadline that Plaintiff failed to meet.

46.    Despite his year of service, contribution, and success, Defendant terminated Plaintiff in violation of the Age Discrimination in Employment Act and Ohio law.

47.    Defendant created unattainable, bad-faith performance expectations that demanded work beyond which he had been expected to do in his 20+ years with the company.

48.    By doing this, Defendant was able to fabricate "unsatisfactory performance" and terminate Plaintiff under the guise of a failed performance improvement plan.

49.    Defendant treated Plaintiff less favorably than other younger employees in the terms and conditions of employment by not setting the same restrictive standards for the younger employees.

50.    Defendant discriminated against Plaintiff based on his age by fabricating performance issues against him and setting unreasonable deadlines, but not treating younger employees in the same fashion.

## COUNT I
### Age Discrimination – R.C. §4112.02

51.    Plaintiff reasserts and reincorporates all allegations in the paragraphs above as if fully rewritten herein.

52.    Plaintiff was born on June 11, 1962 and, at all times relevant hereto, was over 40 years of age, and therefore a member of a protected group.

53.    At all times relevant herein, Plaintiff was qualified for his position.

54.     Defendant discriminated against Plaintiff on the basis of his age by setting him up for failure and for terminating him because he allegedly did not achieve unattainable goals.

55.     Defendant discriminated against Plaintiff on the basis of age by treating him less favorably than other younger employees in the terms and conditions of employment, in violation of Chapter 4112.02 of the Ohio Revised Code.

56.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer lost wages and fringe benefits.

57.     As a direct and proximate result of Defendant's conduct, Plaintiff suffered financial and emotional harm including shame, humiliation, embarrassment, and mental anguish.

58.     Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for all legal damages, including back pay, front pay, lost benefits, emotional distress, compensatory damages, attorneys' fees, costs and other relief available under Ohio Revised Code Chapter 4112, including, but not limited to punitive damages.

## COUNT II
### Age Discrimination – ADEA

59.     Plaintiff reasserts and reincorporates all allegations in the paragraphs above as if fully rewritten herein.

60.     This claim is brought pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, et seq., and as amended, for employment discrimination based on age.

61.     Plaintiff was born on June 11, 1962 and, at all times relevant hereto, was over 40 years of age, and therefore a member of a protected group.

62.     At all times relevant herein, Plaintiff was qualified for his position.

63.     Defendant discriminated against Plaintiff on the basis of his age by setting him up for failure and for terminating him because he allegedly did not achieve unattainable goals.

64.     Defendant discriminated against Plaintiff on the basis of age by treating him less favorably than other younger employees in the terms and conditions of employment, in violation of the ADEA.

65.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer lost wages and fringe benefits.

66.     Defendant willfully discriminated against Plaintiff, in that Defendant knew or showed reckless disregard for the fact that its conduct was prohibited by the ADEA.

67.     Defendant discriminated against Plaintiff on the basis of his age when it terminated him, treating Plaintiff less favorably than employees outside the protected group, in violation of the ADEA, entitling Plaintiff to the remedies contained therein, including but not limited to back pay, front pay, lost benefits, liquidated damages, and attorneys' fees and costs.

WHEREFORE, Plaintiff demands:

For all Counts, monetary damages including back pay and benefits, statutory liquidated damages, expert witness fees and attorneys' fees and costs, and front pay, compensatory damages and punitive damages in an amount to be determined at trial, but

in any event not less than $75,000.00 and any and all other relief, which the Court deems just and appropriate.

Respectfully submitted,

/s/ *Peter G. Friedmann*
Peter G. Friedmann (0089293)
(Pete@thefriedmannfirm.com)
Dominick A. Kocak (0102165)
(Dominick@thefriedmannfirm.com)
**The Friedmann Firm LLC**
3740 Ridge Mill Dr
Hilliard, OH 43026
614-610-9756 (Phone)
614-737-9812 (Fax)
*Attorneys for Plaintiff*

## **JURY DEMAND**

Plaintiff hereby requests a jury of at least eight (8) persons.

/s/ *Peter G. Friedmann*
Peter G. Friedmann (0089293)